Merwin, J.
The plaintiffs are the owners of certain premises in the village of Oriskany, with a woolen mill thereon, the machinery of which is propelled by water taken from the Oriskany creek. They have the first right to the water, to the extent of sufficient to carry eight sets of cards for the manufacture of woolen goods and all the machinery appurtenant thereto.”
The defendants, in 1883, were the owners of certain premises in the same village, on which was situated a grist mill, run by water from the same creek.
It is alleged in the complaint that there is a dam across the said creek, at or near the plaintiff’s premises, and that the premises conveyed to the defendants were conveyed “ subject to the condition that the said dam should be supported and maintained at the joint expense of the said plaintiffs and defendants,” in the proportion of two-thirds by the defendants and one-third by the plaintiffs.
Both parties take the water from this dam through a dyke or feeder. The dam itself is not on the land of either. It is alleged in the complaint that the defendants have used the water from the dam, both before and after the repairs in question were made. The use of the repairs is denied.
From the evidence given at the last hearing, which seems to be more definite than the prior evidence on the subject, it appears that the defendants ceased to use the mill in the spring of 1883. The repairs were made in the fall of 1883, amounting to $610.80.
*363 Before the repairs were made, the defendants were requested to join, but, in substance, declined. They conveyed away their property on the 28th of January, 1885.
The plaintiffs are partners* and their mill property and rights connected therewith are partnership property, but ■the legal title of the premises is in the plaintiff, Henry Waterbury. This, I think, does not prevent the plaintiffs maintaining this action. Fairchild v. Fairchild, 64 N. Y., 471. They made the repairs. They are the parties in interest.
The claim of the plaintiffs is that the rights and liabilities of the parties are fixed by the provisions of a conveyance from Gerrit G. Lansing and wife to the trustees of the Oneida Manufacturing Society bearing date May 7, 1810.
Lansing was the owner of 532 acres of land, through which passed the Oriskany creek, on which there was a •dam, and the water from it was used by Lansing at a gristmill and saw-mill apparently located at or near where the defendant’s grist-mill is now located. The property also included a homestead and farm and village lots. By the deed above referred to, there was conveyed ten acres, and, also, the right of making a canal from the mill pond of Lansing, and thereby conveying at all times so much of the waters of said creek, from the said mill pond to and across the said ten acres, “ as will be ample and sufficient for a cotton factory of 2,000 spindles, and a work shop for making machinery appurtenant to said cotton factory, and for a fulling mill and carding machine,” with the right to the parties of the second part and their successors and assigns forever, of entering upon the lands of said Gerrit or his heirs or assigns, adjoining said canal, with teams and workmen for the purpose of making and repairing the canal, the parties of the second part and their successors and assigns not to be in anywise responsible for any injury accruing by reason of the discharge of the water on to the lands of Lansing or his heirs or assigns’after it has passed over the ten acres, and Lansing for himself and his heirs, executors and administrators covenanted to indemnify and save harmless the parties of the second part and their successors and assigns at all times thereafter against the legal claims and demands of any one for or on account of the turning and diverting the water of the creek from the natural channel by said canal.
Then came this clause: “And the said parties do hereby mutually covenant and agree as follows, to wit:
That the dam across the Oriskany creek at the place where it now stands on Lansing’s land, or at such other place as the parties interested therein shall hereafter mutu *364 ally agree shall be supported and maintained at the joint expense of the said Lansing and his heirs, executors, administrators and assigns, and of the said parties of the second part, and their successors and assigns in the proportions, following, to wit:
The said Lansing and his heirs, executors, administrators and assigns shall contribute two equal third parts of the expense thereof, and the said parties of the second part, and their successors and assigns, shall contribute one equal third part of the expense thereof; provided, however, and it is expressly agreed that if the said Gerrit G. Lansing, his heirs or assigns, shall at any time choose to discontinue the present grist-mill and saw-mill of the said Gerrit and abandon the said dam, he, or his heirs or assigns, shall have a full right to do so, and the said Gerrit, and his heirs, executors, administrators and assigns, shall in that case be completely exonerated from the foregoing covenant of maintaining said dam,” and thereafter the parties of the second part, and their successors and assigns, to bear and sustain the whole expense of said dam, and be entitled forever to use so much of the water as they may choose to divert through the canal.
The deed further stated that the parties of the second part, and their successors and assigns, should have “a free right of taking gravel from the banks of the lands of the said Gerrit, on the southerly side of said mill pond and from the bed of said creek below said dam, for the purpose of maintaining said dam.”
On the 31st of August, 1826, the trustees of the Oneida Manufacturing Society conveyed the property and rights they acquired by the foregoing deed to 1 ‘ The president and directors of the Oriskany Manufacturing Company.”
On the 16th of October, 1821, Gerrit G. Lansing and wife gave to Jonas Platt and Richard R. Lansing a trust deed of the 532 acres, with buildings, mills and appurtenances, excepting the ten acres conveyed to the Oneida Manufacturing Society, and excepting eleven houses and lots theretofore conveyed to divers other parties. Nothing is said in this deed about the dam or the covenants in regard to it.
On May 1, 1823, Platt and R. R. Lansing conveyed to Barrent Bleecker and John R. Bleecker all of the 532 acres and mills and appurtenances that they obtained by the deed of 16th of October, 1821, excepting divers house lots conveyed or contracted by them, and also excepting thirty-four and three-quarters acres next to Mohawk river. This deed was made “subject to the grant formerly made by said Gerrit G. Lansing and wife to the Oneida Manufacturing Society of certain water privileges for the manufacturing establishment at Oriskany.”
*365 On June 4, 1849, a deed is given by James Neilson and others to “The Oriskany Manufacturing Company,” purporting to convey the grist-mill of the late John E. Bleecker and the mansion house built by Gerrit Lansing and the grounds appurtenant thereto, and all the water privileges, mills and buildings on the same. The manner in which these grantors obtained title is not fully apparent, nor is it easy to trace the description, but I shall assume, as counsel on both sides seem to do, that the grantors had title in some way from the Bleeckers, and that the defendant’s property is, with other property, included in the description.
■ Nothing is said in this deed about the ten acre grant or the covenants in regard to the dam. It does not appear whether this deed included the dam.
The Oriskany Manufacturing Company having thus become the owner of both properties, so remained until April 26, 1856, when a deed was given by the sheriff of Oneida county, under an execution sale, to Joseph Bruce, president of the Bank of Whitestown. This deed describes the property by reciting the description and covenants, as in the ten acre deed of May 7, 1810; also, the description as in deed of June 4, 1849. Other real estate is also included. On the 27th of January, 1847, Bruce, president, etc., deeds to Simon N. Dexter the same property, except two acres released to the state for the new channel of the Oriskany creek.
On the 16th of May, 1857, Dexter conveyed to Daniel A. Shaw a portion of the property conveyed by the deed of June 4,1849. The description includes what "is now owned by the defendants, and also other property, and, as I infer, a portion of the dam. It is made “subject to all the conditions of the original deed from the late Gerrit G. Lansing, deceased, under which deed was conveyed ten acres of land and so much of the water power as was for many years owned and occupied by the president and directors of the Oriskany Manufacturing Company; the property hereby conveyed being at all times subject to the first use of the water by the parties of the first part and their successors and assigns forever, in sufficient quantity to carry eight sets of cards for manufacturing woolen goods, and all the machinery appurtenant thereto, or sufficient to afford an equivalent amount of power for any other kind of machinery as has been heretofore used.”
In the latter part of the deed is the clause, “with the hereditaments and appurtenances with the water power as formerly used when the Oriskany factory was in operation.” There are no covenants about the dam or the expense of its maintenance, except what may be inferred from the clauses above quoted.
*366 Shaw, on the 16th of May, 1857, conveyed an undivided half of the property to John E. Hinman, and then, on the-29th of August, 1867, Shaw and the trustee of Hinman, by warranty deed, conveyed to Coleman & Halleck a portion, of the premises covered by the deed to Shaw. They are-described as the premises on which are situated the gristmill occupied by Shaw, and metes and bounds are given. No water lights are specifically given, and nothing is said about the dam, or the covenants in regard to it.
The title of Coleman & Halleck reached the defendants; on September 16, 1880, by deed on foreclosure of mortgage.
Going back now to the title of Dexter, with a view of tracing the title to plaintiff, we find that Dexter, on the 22d: of October, 1857, made a general assignment, and that he- and his assignee, on the 1st of December, 1858, by warranty deed, conveyed to Abel B. Buel a portion of the ten acres, with the buildings thereon, and the .first use of the waters of the Oriskany creek, “in sufficient quantity, if sufficient quantity there shall be, with the present head and fall, to carry eight sets of cards,” etc., together with all the rights to convey the water, and to repair and keep in order the water privileges. These premises and rights, through divers intermediate conveyances, reached Daniel A. Shaw,, on November 14, 1878, and he on the same day, by warranty deed, conveyed the same to the plaintiff, Henry Waterbury.
Upon this statement of the title, the question seems to be,
First. Whether the covenants in the deed of the ten. acres of date, May 7, 1810, are revived and continued in force by the deed from Dexter to Shaw, of date, May 16,. 1857. If so,
Second. Whether the covenant by the grantor to pay two-thirds of the expense of repairing the dam, ran with the land, in such a way as to bind the premises of the defendants.
Third. Whether the fact that Shaw, through whom plaintiffs claim, had previously owned the defendants premises, and had given a warranty,deed.thereof, under which the defendants hold, works out ah,estoppel in favor of the defendants, nothing being said ip-Shaw’s deed of defendant’s title, about-the existence of this covenant to repair.
There is no doubt but that the covenants in the original deed of the ten acres, if they ran with the land of the grantor, were extinguished when the Oriskany Manufacturing .Company became the owner of both properties on 4th June, 1849. (3 Wash. Real Pro., 4th ed., 469, par. 18;-Rawle on Coy., 349), and in such case it is said that the covenants cannot he revived by a new conveyance without a new expres; covenant. There was here no new covenant. *367 The expression “ subject to all the conditions of the original deed, etc.,” did not import or include a promise by the grantor to perform or pay (Palmer v. Fort Plain, etc, 11 N. Y., 376), the taking of a deed, in terms simply subject to a. certain incumbrance does not make the grantee personally Hable.
But assume, as claimed by the plaintiffs, that the deed of May 16, 1857, is to be construed as if there had never been any union of the properties, it cannot in any event operate to cast upon the defendant’s property any greater or further burden than was cast upon it by the original deed. Then we come to the question whether the covenant of the grantor in the original deed ran with the other land of the-grantor. In terms, the covenant of the grantor, was for himself, bis heirs and assigns. In such cases, the rule is, I think, that the burden of such a covenant, or the HabiHty to perform it will adhere exclusively to the original covenantor, unless the relation of privity of estate or of tenure subsist, or be created between the covenantor and covenantee, at the time when the covenant is made (1 Smith’s Leading Cases, 5th Am. ed., 140-1: 2 Wash. Beal Prop., 285). Washburn recognize’s a difficulty in defining what is-meant by “privity of estate.” He, however, concludes-(p. 286), “that such covenants, and such only, run with the land itself, in whosesoever hands it may be, and become united with and form a part of, the consideration for which the land, or some interest in it is parted with, between the covenantor and the covenantee.”
In Herman’s Estoppel (42, § 48), it is said that “Privies in estate are, where there is a mutual or successive relationship as to rights, as in the case of lessor and lessee, donor and. donee, joint tenants, persons who have an interest in an estate created by another.” See, also, Angelí on Watercourses, 6th ed., 440, § 257, et seg.
Between the parties to the deed under consideration, there was no privity of estate that would extend to the-farm and homestead and house lots that remained to the grantor. The covenants about the dam did not certainly run with or bind that part of the property. But as to the dam and the water rights depending thereon, the case is different.
At the start, Lansing owned the dam, and the water-rights connected therewith. He granted a portion of the water rights, taking and giving a covenant in regard to the maintenance of the dam.
These covenants run with the land, each party having a benefit and a burden, which passed with his title so tar-as his interest in the dam and the water rights was concerned. Any subsequent grantee from L'-using, taking *368 the same estate, the same position as to the dam and remaining water rights, that Lansing had on giving the covenant, would be bound by the covenant. The covenant is not by its terms divisible. There is nothing in the evidence to furnish a basis for a division.- So that then the question would be: Did the defendants by their deed from Halleck, or through Coleman and Halleck, acquire the same property as that upon which this covenant was in effect made a charge ?
Concededly the dam is not on defendants’ property. The evidence does- not show that they became the owners of all the water rights except those of plaintiff’s. Their deed in terms conveyed none. Inferentially they had the right to use the water in the manner the grist mill had previously used it, but whether any one else had any right to take or use water, does not appear. Besides this, there is another circumstance which seems to change the situation materially from what it was when Lansing conveyed in 1810, or when Dexter conveyed in 1857. Prior to defendants’ obtaining title, the state of New York appropriated to the use of the Erie canal apparently the larger portion of the Oriskany creek; so that the subject matter upon which rested the covenant has largely disappeared.
The plaintiffs, by their title, have the first right, the measure of the amount being changed in the deed from Dexter to Shaw. The proportion of expense equitably chargeable now would greatly differ from what it was in 1810 or 1857. The plaintiff’s right to enforce the old covenant should therefore clearly appear. It is shown that the plaintiffs and defendants were the only parties using the water prior to the repairs. Is that enough to make the covenant applicable ? Should it not be made to appear that the defendants, by their deed, became vested with the same property and rights that the covenant was a charge upon ?
The argument of plaintiffs is that the' defendants are bound the same as they would be, had this covenant been inserted in the deed to them, as having been made or assumed by them. There are cases, usually between landlord and tenant, where a principle of this kind would apply. There are cases where the acceptance of a deed containing a promise and possession of the property are sufficient to bind the grantees though the deed is not signed by them. But these defendants have never received a conveyance that conveyed the property on which this covenant was a charge, and the receipt of which would be the consideration for the assumption, express or implied, of the burden of the covenant.
Under the complaint, the action is in substance a legal *369 ■one. But were it in equity, the case does not furnish any basis for determining the ratio of equitable contribution.
Were the rights equal, .the contribution would be equal. But when the plaintiffs have the first right that may absorb the whole, and the respective value of the rights does not appear, there is no basis for saying how much each should pay. As the case stands, therefore, and in accordance too, with the theory of the trial, the plaintiffs rest on the covenant, and the recovery if anything, must be in accordance with it.
As to the estoppel by reason of the warranty of Shaw, there seems to be no question about the general rule on the subject. Where one conveys lands with warranty, but without title and afterwards acquires one, his first deed works an estoppel and passes an estate to the grantee the instant the grantor acquires his title, not only against the grantor and those claiming under him, but, also against strangers who come in after the deed creating the estoppel, -and .such title inures to the benefit of the first' grantee by estoppel, to the exclusion of a second grantee to whom the grantor shall execute a deed after having acquired a .title. 3 Wash. Real Prop., 118, par. 37. This operates as well where the. grantor had a present right or interest which passed at the time of the grant, as when nothing whatever passed. House v. McCormick, 57 N. Y., 310. The rights of the parties are the same as if the subsequently acquired estate was held by the grantor at the time he gave his warranty. Bank of Utica v. Mersereau, 3 Barb. Ch., 528. So that if we assume that Shaw, when he conveyed and warranted in 1867, had the title to the plaintiffs’ property, that he acquired November 14, 1878, it would be difficult to avoid the conclusion that the title of defendants’ property passed without the burden of the covenant in question. A man owning a piece of land and, also an incumbrance on it, cannot insist on his incumbrance if he conveyed with warranty without reserving his incumbrance.
But it is claimed that the warranty did not extend to the dam, that as to it, it is only a quit-claim deed. The deed, after describing the premises by metes and bounds, has this clause: ‘ ‘The said parties of the first part also quit-claim to the said parties of the second part all our right and interest in and to the gravel and bed of the Oriskany Creek, to the foot of the state wall on the east side thereof.” Whether this includes the dam is, in the evidence, uncertain. The surveyor testifies that the dam is not on the property of either party. If there is no transfer by the deed of any water rights, then there is nothing to which *370 the eovénant, as to repairs, can attach. If water rights', were transferred, ana were not included by the clause* above quoted, then the warranty reached them. But assume the surveyor mistaken, and that the state wall is above* the dam, then query whether, in the light of the prior deeds, anything more was carried than the gravel and bed of the east side of the creek, taking at most but part of the dam, while the water as actually taken and used at the grist mill was drawn from the factory canal, way below the dam. It looks very clear that the clause quoted was not intended to carry any water rights.
But it is suggested that the obligation to contribute to* repairs would not be deemed an incumbrance. That maybe so as to the general duty on that subject, between joint-owners of water rights. But when that duty is sought to-be fixed by a prior covenant for the benefit of a paramount right, that is another matter and is clearly, I think, an incumbrance. It is entirely different from an implication of law.
I have given a good deal of time to this case, more, perhaps, than its intrinsic importance would call for. Some1 of tbe questions are not easy to solve satisfactorily.
A review of the foregoing opinion, leads me to the conclusion that the deed from Dexter to Shaw May 16, 1857, did not operate to create any personal covenants, ana that, therefore the defendants are not personally bound ;and that, although that deed might perhaps operate to fix the proposition in case repairs were made with the assent of afi parties, or were adopted and used after being made, still in this' case, plaintiffs cannot stand on that basis as the repairs, were not done with the assent of defendants, and it is not-established that they were adopted and used by the defendants after they were made.
It follows that the complaint must be dismissed.